1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  THE ARC OF CALIFORNIA; UNITED              No.  2:11-cv-02545-MCE-CKD
    CEREBRAL PALSY ASSOCIATION
12  OF SAN DIEGO,

13                    Plaintiffs,              **MEMORANDUM AND ORDER**

14        v.

15  TOBY DOUGLAS, in his official
    capacity as Director of the California
16  Department of Health Care Services;
    CALIFORNIA DEPARTMENT OF
17  HEALTH CARE SERVICE; TERRI
    DELGADILLO, in her official capacity
18  as Director of the California
    Department of Developmental
19  Services; CALIFORNIA
    DEPARTMENT OF
20  DEVELOPMENTAL SERVICES; and
    DOES 1-100, inclusive,
21
                     Defendants.
22

23

24        The present lawsuit challenges several changes California has implemented with

25  respect to its payment for services provided to developmentally disabled individuals

26  under the federally funded Medicaid program.

27  ///

28  ///

                                       1

1  Plaintiffs are the ARC of California ("ARC") and the Cerebral Palsy Association of San

2  Diego ("CPA").[1]  Arc is a statewide organization comprised of individuals with intellectual

3  and developmental disabilities (""I/DD"), their families and their home and community-

4  based service providers.  CPA is an non-profit organization serving the needs of

5  individuals with cerebral palsy in San Diego and is affiliated with the national cerebral

6  palsy association.

7      Plaintiffs' Motion for Preliminary Injunction is now before this Court.  That Motion

8  seeks to enjoin California from continuing to implement a 1.25 percent pay rate reduction

9  to disabled service providers passed by the Legislature in 2012, as well as enforcement

10  of mandatory unpaid holidays for providers and a "half day billing" rule in which providers

11  cannot be reimbursed for a full day if their client chooses to leave early for whatever

12  reason, even if the provider has to maintain a full day slot for providing services to the

13  individual.

14      Injunctive relief is sought pursuant to the complaint under three federal sources.

15  Plaintiffs first seek to enjoin the State's billing reductions under the Medicaid Act.  They

16  alternatively seek an injunction under both the Americans with Disabilities Act of 1990,

17  42 U.S.C. § 12101 et seq. ("ADA") and the Rehabilitation Act of 1973, 29 U.S.C. § 794,

18  et seq.. ("Rehabilitation Act").

19

20                      **BACKGROUND**

21

22      Medicaid is a cooperative federal state program designed to provide, pursuant to

23  the Medicaid Act, federal assistance to participating states for the costs of providing

24  medical treatment and services to the poor, elderly and disabled.  42 U.S.C. § 1396.

25  ///

26  ///

27  _____

28  [1] Unless otherwise noted, both ARC and CPA will be collectively referred throughout this
Memorandum and Order as "Plaintiffs."

1    Although state participation in funding available from Medicaid is voluntary, if a state

2    does participate it must comply with the Medicaid Act and its implementing regulations

3    promulgated by the Secretary of Health and Human Services ("HHS").  Wilder v. Va.

4    Hosp. Ass'n, 496 U.S. 498, 502 (1990).  Administration of the Medicaid program,

5    however, is entrusted by HHS to CMS.

6         A state choosing to participate in the Medicaid program must prepare and submit

7    a "State Plan" for federal approval that includes a comprehensive written statement

8    describing the nature and scope of its Medicaid program.  A State Plan must also

9    contain assurances that it will be administered in accordance with the dictates of

10   Medicaid law.  Wilder v. Virginia Hospital Assn., 496 U.S. 498, 502.  Additionally, if a

11   state wants to change its Medicaid plan once approved, it must obtain approval from

12   CMS in the form of a so-called State Plan Amendment ("SPA") to do so..  Exeter

13   Memorial Hosp. Ass'n v. Belshe, 145 F.3d 1106, 1108 (9th Cir. 1998).

14        Among the prerequisites to participation in the Medicaid program is compliance

15   with the requirements set forth within 42 U.S.C. § 1396(a)(30)(A) ("Section 30A")") which

16   requires, inter alia,  that payment for services to the disabled be consistent with

17   "efficiency, economy, and quality of care."  Additionally, in 1981, Congress responded to

18   the large percentage of Medicaid resources being used for long-term institutional care

19   for the disabled by authorizing a home and community-based services ("HCBS") waiver

20   program.  42 U.S.C. § 1396n.  Development of that program was prompted by studies

21   showing that many disabled persons then residing in institutions could in fact live at

22   home, or in the community, if additional support services were available.  The HCBS

23   waiver program is designed to make such services available to those who would benefit

24   from less restrictive care, but who otherwise would be eligible for Medicaid benefits only

25   in an institutional setting.  Id. at § 1396n(c)(1).

26   ///

27   ///

28   ///

3

1    In order to obtain a waiver, a State has to certify that its treatment program is cost-

2    neutral in the sense that the costs of providing services to individuals enrolled in the

3    waiver program will be less than or equal to in the cost of institutional care.  Id. at

4    § 1396n(c)(2)(D); Sanchez v. Johnson, 416 F.3d 1051, 1054 (9th Cir. 2005).

5            States must submit their waiver application to the Centers for Medicare and

6    Medicaid Services ("CMIS"), the federal agency responsible for administering Medicaid

7    based programs, for review.  CMS approval of a submitted application "waives" three

8    requirements of the overall federal Medicaid statute:  1)  statewideness;  2) comparability

9    of services;  and 3) income and resource rules.  Id. at § 1396n(c)(3).  All other

10   requirements of the Medicaid Act are deemed satisfied upon CMS's approval of the

11   waiver request   42 C.F.R. § 400.200; 430.25(g)(1).    In the present case, CMS

12   approved California 's waiver program, including the rates paid to regional centers

13   responsible for delivering care, on March 26, 2012, for an additional term of five years.

14           Unlike other states, California has made its own commitment under the so-called

15   Lanterman Act to pay for services and support to the disabled from its own general

16   funds.  The Lanterman Act (Cal. Welf. & Inst. Code §§ 4500 et seq.) was enacted in

17   1967, some fourteen years before implementation of the federal HCBS waiver program,

18   to prevent or minimize the institutionalization of developmentally disabled persons.   In

19   order to accomplish that objective, disabled persons under the Lanterman Act are

20   entitled to services and supports at California's expense.  Ass'n for Retarded Citizens v.

21   Dept. of Developmental Servs., 38 Cal. 3d 384, 391 (1985).  Because of that right,

22   enrollment by Californians in the waiver program is voluntary and serves primarily as a

23   vehicle for the state to recoup expenses it would already have been obligated to pay

24   under the Lanterman Act (the Medicaid matching funds California receives covers about

25   half the costs of services the regional centers provide to the disabled community).  See

26   Sanchez v. Johnson, 416 F.3d at 1065.  Many of the disabled persons eligible for

27   services under the Lanterman Act in fact lack the extent of impairment qualifying them

28   for federal funds under the HCBS waiver program.  Id.

4

1    In California, the Department of Health Care Services ("DHCS") is the state

2    agency responsible for administering the federal Medicaid program, known as Medi-Cal

3    in California.  The California Department of Developmental Services ("DDS"), however,

4    is responsible for coordinating the provision of services and supports for individuals with

5    developmental services under both the Lanterman Act and for those covered under the

6    HCBS waiver.  DDS is accordingly charged with monitoring the 21 regional centers in

7    California who contract our services for compliance with both federal and state law, and

8    to ensure that high quality services and supports are being provided.  Cal. Welf. & Inst.

9    Code § 4434(a)-(b), 4500.5(d), 4501.   DDS is further charged with promoting uniformity

10   and cost-effectiveness in the operation of regional centers.  Ass'n for Retarded Citizens,

11   38 Cal. 3d at 389.  Despite this mandate, however, DDS' role "does not extend to the

12   manner in which [regional] centers provide services or in general operate their

13   programs."  Id. at 389-90.  Instead, the regional centers themselves determine eligibility,

14   assess needs, and coordinate the provisions of services to individuals within a defined

15   geographic area.  Cal. Welf. and Inst. Code § 4620.  The centers do this through the

16   preparation of an individual program plan ("IPP") for each disabled client and provides

17   services pursuant to the IPP  Although Plaintiffs take issue with the budget cuts

18   prompted by California's recent fiscal crisis, according to the State, any regional

19   center/provider contract must include a provision that payment under the contract is

20   dependent upon the availability of state funds, and that vendors must agree to accept

21   rates established, revised or adjusted by the Department as payment in full for all

22   services provided.  Cal. Code of Regs, Title 17, §§ 50609, 54326.

23   Despite that admonition, Plaintiffs challenge four bills, as enacted by the

24   California Legislature since 2009, that operate to reduce of freeze rates to HCBS

25   providers.  Using payment levels from 2003, the Legislature initially enacted a three

26   percent reduction from those rates effective February 1, 2009, through June 30, 2010.

27   That reduction, along with an additional 1.25 percent cut, was ultimately extended

28   through June 30, 2012.

1   After June 30, 2012, the reimbursement reduction was decreased to only 1.25 percent,

2   where it remains at present.  In addition, as indicated above, another bill sets forth 14

3   unpaid holidays for which vendors are not reimbursed for their services.  Finally, the

4   so-called half-day billing rule limited regional centers to payment for only a half day if a

5   patent was present less than 65 percent of a program day.  The State maintains that

6   those reductions apply to all disabled individuals irrespective of whether they qualify for

7   services under the waiver or under the Lanterman Act.

8       It should also be noted that irrespective of these reductions, regional centers can

9   still obtain an exemption from reduced payments (but not apparently for the holiday or

10  half-day rule limitations) upon a showing that a non-reduced payment is necessary to

11  protect the health and safety of the individual from whom the services and supports are

12  proposed to be purchased.  SB 853, AB 104.  Moreover, patients themselves (or their

13  representatives) can avail themselves of a tiered appeal process should they believe

14  that the services being provided are inadequate.   Finally, consumers can submit a

15  complaint directly to DDS if their particular problem does not fit within other grievance

16  mechanisms.

17      Plaintiffs now seek to enjoin California's reimbursement reduction measures on

18  grounds that those measures were taken without complying with Medicaid's procedural

19  and substantive requirements under federal law.  Plaintiffs contend that they

20  demonstrate a probability of success on their arguments in that regard, and claim that

21  irreparable harm is shown because failing to provide the disabled with services

22  commensurate with their particular needs subjects them both to a substantial risk of

23  harm and an increased risk of hospitalization.  Plaintiffs make a similar argument with

24  respect to their Rehabilitation Act and ADA claims, arguing that failure to provide

25  adequate access constitutes discrimination on the basis of disability.

26  ///

27  ///

28  ///

1    Plaintiffs correctly point out that the Supreme Court, in Olmstead v. L.C. ex rel. Zimring,

2    527 U.S. 581 (1999), found that Title II of the ADA requires states to provide community-

3    based treatment, rather than institutionalization, where such treatment is appropriate and

4    can be reasonably accommodated.  Moreover, the Ninth Circuit, in Townsend v. Quasim,

5    328 F.3d 511, 516-17 (9th Cir. 2003, similarly found, under an Olmstead analysis, that

6    failure to provide Medicaid services to the disabled in a community-based setting is a

7    form of discrimination on the basis of disability.

8

9                                        **STANDARD**

10

11          The issuance of preliminary injunctive relief is an extraordinary remedy, and

12   Plaintiffs have the burden of demonstrating the propriety of such a remedy by clear and

13   convincing evidence.   See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Granny

14   Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442 (1974).  Following the Supreme

15   Court's decision in Winter v. Natural Resources Defense Council, 129 S. Ct. 365 (2008),

16   the party requesting such relief must show that "he is likely to succeed on the merits, that

17   he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance

18   of equities tips in his favor, and that an injunction is in the public interest."  Stormans,

19   Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting Winter, 129 S. Ct. at 374.

20   Alternatively, under the so-called sliding scale approach, as long as the Plaintiffs

21   demonstrate the requisite likelihood of irreparable harm and show that an injunction is in

22   the public interest, a preliminary injunction can still issue so long as serious questions

23   going to the merits are raised and the balance of hardships tips sharply in Plaintiffs'

24   favor.  Alliance for Wild Rockies v. Cottrell, 2010 WL 2926463 at *4-7 (9th Cir. July 28,

25   2010) (finding that sliding scale test for issuance of preliminary injunctive relief remains

26   viable after Winter).

27   ///

28   ///

                                          7

1    Plaintiffs argue that the Ninth Circuit has found injunctive relief to be appropriate

2    where a state reduces payments to Medicaid providers without complying with Medicaid

3    requirements.  Orthopaedic Hospital v. Belshe, 103 F.3d 1491, 1496 (9th Cir. 1997).

4    Plaintiffs further claim that injunctive relief under the ADA and the Rehabilitation has

5    been ordered where state action places disabled individuals at a serious risk of

6    institutionalization by reducing access to community-based care.  See M.R.. v. Dreyfus,

7    663 F.3d 1100 (9th Cir. 2012).

8

9                                      **ANALYSIS**

10

11   **A.  Success on the Merits**

12

13   With respect to California's noncompliance with Medicaid law, Plaintiffs basically

14   contend that the State failed to comply with the rate setting requirements set forth in

15   42 U.S.C. § 1396a(a)(30)(A) ("Section 30(A)").  Section 30(A) requires that payment for

16   services must be "consistent with efficiency, economy, and quality of care."  The Ninth

17   Circuit, in its Orthopaedic decision, interpreted this statutory language as meaning that

18   "payments must be sufficient to enlist enough providers to provide access to Medicaid

19   recipients."  Orthopaedic, 103 F.3d at 1496.  The Orthopaedic case further found that

20   DHCS "must set hospital outpatient reimbursement rates that bear a reasonable

21   relationship to efficient and economical hospital's costs of providing quality services,"

22   and that in making such determinations it must rely on "responsible cost studies" that

23   "provide reliable date as a basis for its rate setting."  Id.  Plaintiffs claim that the State

24   has done nothing to ascertain whether the challenged payment reductions are consistent

25   with federal rate-setting standards and requirements.

26   Defendants take issue with Plaintiffs' argument in several ways.  First, they argue

27   that Section 30(A), while applicable to Medicaid in general, nonetheless does not apply

28   to an HCBS waiver like that at issue here.

8

1    According to Defendants, the HCBS waiver regulations themselves appear to exempt

2    waiver applicants from the Section 30(A) requirements.  Second, Defendants point to a

3    recent Ninth Circuit decision, Managed Pharmacy Care v. Sebelius, 2013 WL 2278620

4    (9th Cir. May 24, 2013)[2] that they claim is controlling here.  Managed Care found that

5    where, as here, CMS approves state provisions that include reimbursement reductions,

6    that approval is entitled to so-called Chevron deference.

7         Section 30(A) states that a state plan for medical assistance under the Medicaid

8    Act must

9         provide such methods and procedures relating to the
10        utilization of, and the payment for, care and services
          available under the plan… as may be necessary to safeguard
          against unnecessary utilization of such care and services and
11        to assure that payments are consistent with efficiency,
          economy, and quality of care and are sufficient to enlist
12        enough providers so that care and services are available
          under the plan at least to the extent that such care and
13        services are available to the general population in the
          geographic area.
14

15   42 U.S.C. § 1396a(a)(30)(A) (emphasis added).

16        This language, as the Ninth Circuit recognizes, is "broad and diffuse".  Sanchez v.

17   Johnson, 416 F.3d at 1060.  By using terms like "consistent," "sufficient," efficiency," and

18   "economy," without describing the specific steps a state must take in order to meet such

19   standards, the amorphous language of the statute indicates that agency expertise is

20   relevant in determining its application,  Managed Care, 2013 WL at *9, citing Douglas v.

21   Indep. Living Ctr. of S. Cal., 132 S. Ct. 1204, 1210 (2012).

22        In Orthopaedic, the Ninth Circuit interpreted the statutory mandate of Section

23   30(A) as requiring Medicaid reimbursement rates to "bear a reasonable relationship to

24   efficient and economical" hospital costs for providing quality services.

25   ///

26

27   _____

     [2] The Managed Care decision was initially issued on December 13, 2012.  Managed Pharmacy
     Care v. Sebelius, 705 F.3d 934 (9th Cir. 2012).  On May 24, 2013, after no rehearing en banc was
28   requested, the initial decision was withdrawn and reissued without significant change at 2013 WL
     2278620.

1    To do this, the Orthopaedic court reasoned, the state had to "rely on responsible cost

2    studies, its own or others that provide reliable data as a basis for its rate setting."

3    103 F.3d at 1496.  As Defendants note, this interpretation of Section 30(A) as requiring

4    cost studies is not found in the statute itself and was made in the absence of any agency

5    approval for the reimbursement reductions that the court considered.

6          The Managed Care decision looks at the issue anew under circumstances where

7    CMS had in fact approved reimbursement reductions incorporated within a proposed

8    State Plan Amendment ("SPA") for the provision of Medicaid services in general.

9    Plaintiffs in that case argued that because cost data had not been provided in the SPA

10   submitted by California, the Ninth Circuit's prior Orthopaedic decision mandated that any

11   reimbursement reduction approval be voided.  Even  the Orthopaedic court, however,

12   recognized that "our standard of review might have been different had the agency

13   spoken on the issue."  See Managed Care, 2013 WL 2278620 at *7.  Significantly, in

14   Managed Care, unlike Orthopaedic, CMS did explicitly approve the SPA at issue, even

15   though no cost studies had been submitted.   Managed Care court held that the

16   agency's decision in that regard was entitled to deference, and found that California is

17   not required to conduct cost studies or follow any specific procedural steps before

18   reducing Medicaid reimbursement rates under Section 30(A).  Managed Care, 2013 WL

19   2278620 at *2.

20         Defendants argue that because CMS in this case approved the HCBS waiver

21   submitted by California, then Managed Care disposes of Plaintiffs' seminal claim that the

22   reimbursement reductions run afoul of Medicaid law.  Plaintiffs, on the other hand, try to

23   distinguish Managed Care on grounds that it involved approval of an SPA amendment,

24   not an HCBS waiver and should, accordingly, be distinguishable.  Plaintiffs further

25   contend that CMS lacked any real cost of service information, and that any approval

26   without that information was in error.

27         The fact that Managed Care involved an SPA amendment and the present case

28   revolves around an HCBS waiver is not of consequence.

1    In both instances, CMS approval for state Medicaid programs involving reimbursement

2    reductions is involved.  Moreover, with respect to whether adequate information was

3    presented to CMS with respect to cost was presented, in accordance with <u>Managed</u>

4    <u>Care</u>, that question is superseded by the fact that CMS approved the waiver.  The

5    evidence indicates that California submitted a waiver application in excess of 200 pages.

6    That application was required to provide information about 1) methods for assessing

7    financial accountability and cost-neutrality; 2) information regarding the utilization of

8    services by consumers, including the number of participants and information regarding

9    the utilization of specified services; and 3) assurances that the state will protect the

10   health and welfare of beneficiaries, including assurances that the state will provide

11   ongoing assessment of a consumer's need for services, and a plan for evaluation.

12   42 C.F.R. §§ 441.302-303.   While Plaintiffs contend that CMS never required any

13   specific information with regard to rates or rate methodology in the HCBS waiver, CMS

14   nonetheless approved the waiver application on the basis of the detailed application that

15   was submitted.  Significantly, to counter any claim that insufficient information was in fact

16   provided, CMS also has authority to revoke an HCBS waiver application at any time if it

17   determines, post-approval, that a state is not in compliance.  <u>Id.</u> at §§ 430.25,

18   441.300-310.

19        Given these requirements, I believe that CMS' determination in approving

20   California's 2012 waiver application is entitled to <u>Chevron</u> deference just as the SPA

21   approval was so deemed in <u>Managed Care</u>.  To the extent that CMS approved the

22   waiver in error for any reason, that shortcoming should be brought to CMS' attention

23   directly by way of a claim under the Administrative Procedures Act, rather than through

24   the present lawsuit against California.   <u>Douglas v. Indep. Living Ctr. of S. Cal.</u>,

25   132 S. Ct. at  1210.

26   ///

27   ///

28   ///

11

1    Secondly, and just as importantly, the cost study information that Plaintiffs argue

2   should have been included does not appear to have been required for a waiver in any

3   event.  42 C.F.R. § 441.303(g) indicates that cost analysis is optional, rather than

4   required, in the context of waiver applications.  As the regulations state:  "The State, at

5   its option, may provide for an independent assessment of its waiver that evaluates the

6   quality of care provided, access to care, and cost neutrality."  Id.  Significantly this

7   language for all intents and purposes incorporates the considerations set forth in Section

8   30(A).  By expressly indicating that such information is not mandatory, a persuasive

9   argument can be made that Section 30A) compliance is not required, just as Defendants

10  contend.  At the very least, that interpretation of the regulations is a reasonable one.

11  Agency interpretation and application of its own regulations is entitled to deference.

12  Chase Bank USA v. McCoy, 131 S. Ct. 871, 880-82 (2011); Auer v. Robbins, 519 U.S.

13  452, 461 (1997) (federal agency's interpretation of regulation entitled to deference

14  unless "plainly erroneous or inconsistent with the regulation").

15    Finally, with respect to Plaintiffs' claims under the ADA and the Rehabilitation Act,

16  the papers submitted in support of this Motion make it clear those claims also hinge on

17  Defendants' alleged non-compliance with the Rule 30(A) factors, and the alleged

18  discriminatory effect this has on individuals qualifying for services under the HCBS

19  waiver.[3]  Plaintiffs' Opening Points and Authorities, for example, state unequivocally that

20  by denying HCSB beneficiaries the protections of Section 30(A), the State is engaging in

21  discrimination on the basis of disability" in contravention of both the ADA and the

22  Rehabilitation Act.  ECF No. 83-1, 17:7-9.

23  ///

24

25        [3] It should be noted that California claims there is no practical difference between HCBS waiver
    and Lanterman Act beneficiaries in the first place, because under the Lanterman Act, California
26  guarantees the provision of community-based services to the disabled irrespective of whether the disabled
    consumer also happens to qualify under the federal HCBS waiver.  As indicated above, California views
27  the waiver program as a reimbursement program for services it is already obligated to provide.  Because
    the two programs consequently conflate in this regard, the State contends that there is no divergent
28  treatment between the two groups that could trigger protection under either the ADA or the Rehabilitation
    Act.

1    Plaintiffs' reply reiterates this position by phrasing the salient issue under both the ADA

2    and Rehabilitation Act as whether the state may permissibly deny HCBS participants

3    "the statutory protections of Section 30(A).  ECF No. 93: 2:4-10      Because Plaintiffs are

4    unlikely to prevail on their claims predicated on Section 30(A) for the reasons stated

5    above, their ADA and Rehabilitation Act claims which similarly turn on alleged violations

6    of Section 30(A) are no more likely to be successful..

7         For all of the above articulated reasons, Plaintiffs are unlikely to prevail on the

8    merits.  Therefore, this factor weighs against granting any injunctive relief.  In fact, since

9    under either test for granting a preliminary injunction a likelihood of success is required,

10   that shortcoming alone precludes the requested relief.

11

12       **B.  Irreparable Harm**

13

14        Even if Plaintiffs could overcome the hurdle of demonstrating a likelihood of

15   success, which I believe they cannot, it is by no means certain whether Plaintiffs could

16   satisfy the irreparable harm requirement for purposes of qualifying for a preliminary

17   injunction.  A mere "possibility" of irreparable injury is insufficient to support an injunction.

18   Winter, 129 S. Ct. at 375.  Further, a "plaintiff's long delay before seeking a preliminary

19   injunction implies a lack of urgency and irreparable harm."  Oakland Tribune, Inc. v.

20   Chronicle Pub. Co., Inc., 762 F.2d 1374, 1377 (9th Cir. 1985).

21         Plaintiffs have submitted eighteen declarations from providers, seven

22   declarations from parents, and two declarations from experts detailing the alleged risk of

23   harm resulting from the continuing reimbursement cuts.  They argue that after nearly ten

24   years of frozen rates (since 2003), additional payments reductions (both directly and

25   indirectly), are driving providers towards insolvency, therefore destabilizing and

26   degrading the delivery of services and jeopardizing the health, safety and welfare of

27   innumerable disabled individuals and family members.

28   ///

1  The declarations from family members document the alleged decrease in access and

2  quality of services as well as the real consequences those shortcomings have on the

3  disabled as well as their families.  Plaintiffs claim that the cutbacks are more

4  disproportionately felt by individuals with the most severe and debilitating conditions,

5  since those conditions usually require a higher level and/or quality of care.

6        Defendants contend that the requisite harm is not presented by the declarations

7  since they focus on potential harm which may occur in the future rather than concrete

8  harm that is either happening now or will happen imminently if the requested injunctive

9  relief does not issue.  According to Defendants, the harm identified is generalized,

10  amorphous, and conjectural in nature.  Plaintiffs not surprisingly take issue with that

11  characterization, arguing that they should not have to wait until catastrophic harm occurs

12  before they are entitled to stop what they allege are harmful and discriminatory practices

13  against disabled individuals.

14        Plaintiffs point to the Ninth Circuit's decision in M.R. v. Dreyfus, 697 F.3d 706 (9th

15  Cir. 2011), where a preliminary injunction was granted with respect to disability service

16  payment reductions, as supportive of their position.  In Dreyfus, however, unlike the

17  present case, twelve individual plaintiffs presented substantial evidence of serious risk of

18  institutionalization caused by the regulations at issue.   Plaintiffs have not shown that

19  any consumer has failed to receive services and supports identified in his or her IPP as

20  a result of the statutory payment reductions. See id. at 726-727.

21        Although the declarations do appear to recite program cuts and effects upon

22  individuals that may amount to more than mere speculation, it is uncontroverted that the

23  payment reductions at issue were in place more than two years before suit was filed on

24  behalf of Plaintiffs in 2011. In addition, since 3.0 percent cutbacks in place since 2009-

25  10 ultimately sunsetted in June of 2012, leaving only 1.25 percent in reimbursement

26  reductions currently in place, Plaintiffs are now receiving more reimbursement than at

27  any time since 2009.

28  ///

1   Plaintiffs counter by arguing that the reductions were initially billed as temporary, and

2   that it was only after they were extended three times that they realized this was not the

3   case and they, consequently, in desperation, filed the present lawsuit.  Nonetheless, the

4   fact that Plaintiffs unquestionably waited some two years before commencing this action

5   weighs against irreparable harm under the Oakland Tribune case cited above.

6        Another factor that must be mentioned is the fact that under the terms of the

7   reimbursement reduction legislation at issue, regional centers have the right to apply for

8   an exemption from any reduced payments.  If it is demonstrated that an exemption is

9   necessary to protect a consumer's health or safety, the DDS is authorized to grant such

10  exemptions.  Brian Winfield Decl., ¶¶ 15-16.[4]  Defendants claim there is no evidence

11  that any exemptions have been sought and denied by any regional center.  Plaintiffs

12  argue in response, however, that the exemptions are limited in scope because by their

13  terms they are limited only to concerns of "health and safety" rather than to a consumer's

14  overall welfare and well-being.  Plaintiffs also argue that the exemption applies only to

15  the percentage payment reductions themselves, and offer no avenue for alleviating the

16  mandatory holiday and half-day billing provisions also targeted by this lawsuit.

17  Nonetheless Plaintiffs' failure to demonstrate that any exemption has been sought bears

18  adversely on the claimed irreparable harm.

19       Similarly, consumers themselves may invoke a fair hearing process to resolve any

20  dispute they have with regard to support and services provided by the regional centers.

21  Such an appeal has to be filed within 30 days following notification of a decision or

22  action with which the consumer is dissatisfied, and includes an escalated process

23  starting with a voluntary informal meeting, and proceeding as necessary to mediation

24  and then to full hearing.  Winfield Decl., ¶¶ 6-8.

25  ///

26  _____

    [4] The Court notes that both sides have submitted lengthy objections to certain evidence submitted
27  both in support of and in opposition to this Motion, including the Declaration of Brian Winfield.  To the
    extent this Memorandum and Order cites facts from the challenged evidence, those objections are
    overruled.  Otherwise, because the evidence at issue was not germane to the Court's decision herein, the
28  Court need not specifically rule on the propriety of the remaining objections and declines to do so.

1  Significantly too, with the exception of two consumers, Joseph Napoliello and Megan

2  Alexander, Plaintiffs have presented no evidence that any fair hearing process has been

3  sought with regard to the reductions at issue.  Even with regard to Napoliello and

4  Alexander, their complaints were resolved at the initial informal level inasmuch as the

5  requested actions (additional supportive living services and a full-sized hospital mattress,

6  respectively) were granted.

7       Also militating against the requisite irreparable harm is evidence presented by

8  Defendants indicating that the challenged payment reductions have not resulted in an

9  increase in the risk of serious harm to disabled consumers, or an increased risk of

10  institutionalization.  Brian Winfield, who is a Deputy Director for DDS charged with

11  monitoring and oversight over California's 21 regional centers,  indicates  that the

12  number of disabled individuals institutionalized in licensed state hospitals has steadily

13  declined between June 28, 2006, and June 2012 (from 2.956 to 1,686), despite the

14  challenged reimbursement cuts which Plaintiffs allege has increased the likelihood of

15  such institutionalization.  Winfield Decl., ¶¶ 18-20.  Similarly, the incidence of injuries to

16  consumers has also declined from 70 reports per thousand customers during the

17  2006-07 fiscal year to 66 for 2011-12.  Id. at ¶¶ 24-25.

18       In sum, given the delay in filing the present lawsuit, Plaintiffs' additional failure to

19  show any real attempt to obtain available relief from the regional centers responsible for

20  providing necessary supports and services, as well as data provided by Defendants

21  suggesting that that the claimed detriment has not materialized, this Court finds

22  irreparable harm prerequisite for injunctive relief has also not been established.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

**C.  Balance of Hardships/Public Interest**

2

3        While Plaintiffs offer the emotion-laden argument that protection of the

4   developmentally disabled, as individuals constituting one of the most vulnerable portions

5   of our society, far outweighs any budgetary concern on behalf of the state, as set forth

6   above this Court has concluded that Plaintiffs have not demonstrated that Defendants

7   did anything in contravention of the Medicaid Act that merits injunctive relief.  Moreover,

8   Plaintiffs' showing of irreparable harm is sketchy at best.  On the other hand, as

9   Defendants point out, granting a preliminary injunction here would likely destabilize the

10  entire disability service delivery system, in part because of the difficulty in immediately

11  implementing new programs and provider payment structures, which the State estimates

12  would take a minimum of three months to implement.  Decl. of Barbara Golterman,

13  ¶¶ 3-6.   Budgetary shortfalls in DDS' budget occasioned by granting the requested

14  injunction could also disrupt the entire service delivery  system.  Decl. of Mark

15  Hutchinson, ECF No. 78-1, ¶ 2.    Consequently, the balance of hardships does not

16  weigh in favor of Plaintiffs' position either in the view of this Court.

17

18                              **CONCLUSION**

19

20        Based on the foregoing, the Court finds that Plaintiffs have not demonstrated by

21  clear and convincing evidence their entitlement to the extraordinary relief of a preliminary

22  injunction in this matter.  First and most importantly, they have failed to show a likelihood

23  of success on the merits.

24  ///

25  ///

26  ///

27  ///

28  ///

1   Beyond that shortcoming, they have also not established the requisite irreparable harm

2   and further have now shown that the balance of harms tips squarely in their favor.  For

3   all these reasons Plaintiffs' Motion for Preliminary Injunction  (ECF No. 83) is DENIED.

4          IT IS SO ORDERED.

5   Dated:  July 1, 2013

6

7

8                                        _____

                                      MORRISON C. ENGLAND, JR, CHIEF JUDGE
9                                      UNITED STATES DISTRICT COURT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28