1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   THE ARC OF CALIFORNIA; UNITED            No.  2:11-cv-02545-MCE-CKD
     CEREBRAL PALSY ASSOCIATION
12   OF SAN DIEGO,

13                Plaintiffs,                  **MEMORANDUM AND ORDER**

14        v.

15   TOBY DOUGLAS, in his official
     capacity as Director of the California
16   Department of Health Care Services;
     CALIFORNIA DEPARTMENT OF
17   HEALTH CARE SERVICE; TERRI
     DELGADILLO, in her official capacity
18   as Director of the California
     Department of Developmental
19   Services; CALIFORNIA
     DEPARTMENT OF
20   DEVELOPMENTAL SERVICES; and
     DOES 1-100, inclusive,
21

22                Defendants.

23

24        The present lawsuit challenges several changes California has implemented with

25   respect to its payment for services provided to developmentally disabled individuals

26   under the federally funded Medicaid program.

27   ///

28   ///

                                           1

1   Plaintiffs are the ARC of California ("ARC") and the Cerebral Palsy Association of

2   San Diego ("CPA").[1]  ARC is a statewide organization comprised of individuals with

3   intellectual and developmental disabilities (""I/DD"), their families, and their home and

4   community-based service providers.  CPA is a non-profit organization serving the needs

5   of individuals with cerebral palsy in San Diego and is affiliated with the national cerebral

6   palsy association.

7          According to Plaintiffs,  the California Department of Health Care Services and the

8   California Department of Developmental Services,[2] both of which are involved in

9   administering the provision of support provided to disabled individuals, have violated

10  federal law in reducing certain payments to the providers of those services.  Plaintiffs

11  initially allege, in their First Claim for Relief,  that Defendants have violated the

12  provisions of the Medicaid Act by administering  its payments for community-based

13  services to the disabled absent compliance with the provisions of 42 U.S.C.

14  §1396(a)(30)(A).  Plaintiffs go on to assert, in their Second and Third Claims for Relief,

15  that Defendants' payment reductions also violate the Americans with Disabilities Act of

16  1990, 42 U.S.C. § 12101 et seq. ("ADA") and the Rehabilitation Act of 1973, 29 U.S.C.

17  § 794, et seq. ("Rehabilitation Act"),  respectively.  Declaratory relief, under the Federal

18  Declaratory Judgment Act, 28 U.S.C. § 2201, is also requested by way of the Sixth

19  Claim.  Finally, Plaintiffs seek injunctive, mandamus and declaratory relief through

20  pendant state law claims.

21          Defendants' Motion to Dismiss now before the Court contends that the allegations

22  set forth in Plaintiffs' Complaint fail to state any federal claim upon which relief can be

23  granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

24  ///

25  ───────────────

26  [1] Unless otherwise noted, both ARC and CPA will be collectively referred throughout this
    Memorandum and Order as "Plaintiffs".

27  [2] Both California agencies are sued through their respective Directors and will be collectively
    referred to as "Defendants" or the "State" throughout this Memorandum and Order unless otherwise
28  specified.

1    In the absence of a claim sounding under either the Medicaid Act, the ADA or the

2    Rehabilitation Act, Defendants go on to assert that the Court should decline to exercise

3    jurisdiction over the pendent state law claims.  Alternatively, Defendants argue that

4    Plaintiffs' state law claims are barred by the doctrine of sovereign immunity in any event.

5          As set forth below, Defendants' Motion to Dismiss will be granted in part and

6    denied in part.

7

8                    **BACKGROUND**

9

10          Medicaid is a cooperative federal state program designed to provide, pursuant to

11    the Medicaid Act, federal assistance to participating states for the costs of providing

12    medical treatment and services to the poor, elderly and disabled.  42 U.S.C. § 1396.

13    Although state participation in funding available from Medicaid is voluntary, if a state

14    does participate, it must comply with the Medicaid Act and its implementing regulations

15    promulgated by the Secretary of Health and Human Services ("HHS").  <u>Wilder v. Va.</u>

16    <u>Hosp. Ass'n</u>, 496 U.S. 498, 502 (1990).  Administration of the Medicaid program,

17    however, is entrusted by HHS to CMS.

18          A state choosing to participate in the Medicaid program must prepare and submit

19    a "State Plan" for federal approval that includes a comprehensive written statement

20    describing the nature and scope of its Medicaid program.  A State Plan must also

21    contain assurances that it will be administered in accordance with the dictates of

22    Medicaid law.  <u>Wilder v. Virginia Hospital Assn.,</u> 496 U.S. 498, 502.  Additionally, if a

23    state wants to change its Medicaid plan once approved, it must obtain approval from

24    CMS in the form of a so-called State Plan Amendment ("SPA") to do so.  <u>Exeter</u>

25    <u>Memorial Hosp. Ass'n v. Belshe</u>, 145 F.3d 1106, 1108 (9th Cir. 1998).

26    ///

27    ///

28    ///

1  Among the prerequisites to participation in the Medicaid program is compliance

2  with the requirements set forth within 42 U.S.C. § 1396a(30)(A) ("Section 30(A)") which

3  requires, inter alia  that payment for services to the disabled be consistent with

4  "efficiency, economy, and quality of care."  Additionally, in 1981, Congress responded to

5  the large percentage of Medicaid resources being used for long-term institutional care

6  for the disabled by authorizing a home and community based services ("HCBS") waiver

7  program.  42 U.S.C. § 1396n.  Development of that program was prompted by studies

8  showing that many disabled persons then residing in institutions could in fact live at

9  home, or in the community, if additional support services were available.  The HCBS

10  waiver program is designed to make such services available to those who would benefit

11  from less restrictive care, but who otherwise would be eligible for Medicaid benefits only

12  in an institutional setting.  Id. at § 1396n(c)(1).  In order to obtain a waiver, a State has to

13  certify that its treatment program is cost-neutral in the sense that the costs of providing

14  services to individuals enrolled in the waiver program will be less than or equal to in the

15  cost of institutional care.  Id. at § 1396n(c)(2)(D); Sanchez v. Johnson, 416 F.3d 1051,

16  1054 (9th Cir. 2005).

17  States must submit their waiver application to the Centers for Medicare and

18  Medicaid Services ("CMIS"), the federal agency responsible for administering Medicaid

19  based programs, for review.  CMS' approval of a submitted application "waives" three

20  requirements of the overall federal Medicaid statute:  1)  statewideness;  2) comparability

21  of services;  and 3) income and resource rules.  Id. at § 1396n(c)(3).  All other

22  requirements of the Medicaid Act are deemed satisfied upon CMS's approval of the

23  waiver request   42 C.F.R. § 400.200; 430.25(g)(1).  In the present case, CMS approved

24  California 's waiver application, including the rates paid to regional centers responsible

25  for delivering care, on March 29, 2012, for an additional term of five years.[3]

26  ///

27

28  [3] Plaintiffs' Request for Judicial Notice of that Application, as subsequently approved by CMS, is unopposed and is granted under Federal Rule of Evidence 201.

4

1    Unlike other states, California has made its own commitment under the so-called

2    Lanterman Act to pay for services and support to the disabled from its own general

3    funds.  The Lanterman Act (Cal. Welf. & Inst. Code § 4500 et seq.) was enacted in 1967,

4    some fourteen years before implementation of the federal HCBS waiver program, to

5    prevent or minimize the institutionalization of developmentally disabled persons.   In

6    order to accomplish that objective, disabled persons under the Lanterman Act are

7    entitled to services and supports at California's expense.  Ass'n for Retarded Citizens v.

8    Dept. of Developmental Servs., 38 Cal. 3d 384, 391 (1985).  Because of that right,

9    enrollment by Californians in the waiver program is voluntary and serves primarily as a

10   vehicle for the state to recoup expenses it would already have been obligated to pay

11   under the Lanterman Act (the Medicaid matching funds California receives covers about

12   half of the costs of services the regional centers provide to the disabled community) .

13   See Sanchez v. Johnson, 416 F.3d at 1065.  Many of the disabled persons eligible for

14   services under the Lanterman Act, in fact, lack the extent of impairment qualifying them

15   for federal funds under the HCBS waiver program.  Id.

16   In California, the Department of Health Care Services ("DHCS") is the state

17   agency responsible for administering the federal Medicaid program, known as Medi-Cal

18   in California.  The California Department of Developmental Services ("DDS"), however,

19   is responsible for coordinating the provision of services and supports for individuals with

20   developmental services under both the Lanterman Act and for those covered under the

21   HCBS waiver.  DDS is accordingly charged with monitoring the 21 regional centers in

22   California who contract out services for compliance with both federal and state law, and

23   to ensure that high quality services and supports are being provided.  Cal. Welf. & Inst.

24   Code § 4434(a)-(b), 4500.5(d), 4501.  DDS is further charged with promoting uniformity

25   and cost-effectiveness in the operation of regional centers.  Ass'n for Retarded Citizens,

26   38 Cal. 3d at 389.  Despite this mandate, however, DDS' role "does not extend to the

27   manner in which [regional] centers provide services or in general operate their

28   programs."

5

1    Id. at 389-90.  Instead, the regional centers themselves determine eligibility, assess

2    needs, and coordinate the provisions of services to individuals within a defined

3    geographic area.  Cal. Welf. & Inst. Code § 4620.  The centers do this through the

4    preparation of an individual program plan ("IPP") for each disabled client and provides

5    services pursuant to the IPP.   Although Plaintiffs take issue with the budget cuts

6    prompted by California's recent fiscal crisis, according to the State, any regional

7    center/provider contract must include a provision that payment under the contract is

8    dependent upon the availability of state funds, and that vendors must agree to accept

9    rates established, revised or adjusted by the Department, as payment in full for all

10   services provided.  Cal. Code of Regs, Title 17, §§ 50609, 54326.

11          Despite that admonition, Plaintiffs challenge four bills, as enacted by the

12   California Legislature since 2009, which operate to reduce of freeze rates to HCBS

13   providers.  Using payment levels from 2003, the Legislature initially enacted a three

14   percent reduction from those rates effective February 1, 2009, through June 30, 2010.

15   That reduction, along with an additional 1.25 percent cut, was ultimately extended

16   through June 30, 2012.  After June 30, 2012, the reimbursement reduction was

17   decreased to only 1.25 percent, where it remains at present.  In addition, as indicated

18   above, another bill sets forth 14 unpaid holidays for which vendors are not reimbursed

19   for their services.  Finally, the so-called half-day billing rule limited regional centers to

20   payment for only a half day if a patent was present less than 65 percent of a program

21   day.  The State maintains that those reductions apply to all disabled individuals

22   irrespective of whether they qualify for services under the waiver or under the Lanterman

23   Act.

24          It should also be noted that irrespective of these reductions, regional centers can

25   still obtain an exemption from reduced payments (but not apparently for the holiday or

26   half-day rule limitations) upon a showing that a non-reduced payment is necessary to

27   protect the health and safety of the individual from whom the services and supports are

28   proposed to be purchased.  SB 853, AB 104.

1 Moreover, patients themselves (or their representatives) can avail themselves of a tiered

2 appeal process should they believe that the services being provided are inadequate.

3 Finally, consumers can submit a complaint directly to DDS if their particular problem

4 does not fit within other grievance mechanisms.

5

6 **STANDARD**

7

8       On a motion to dismiss for failure to state a claim under Federal Rule of Civil

9 Procedure 12(b)(6), all allegations of material fact must be accepted as true and

10 construed in the light most favorable to the nonmoving party.  Cahill v. Liberty Mut. Ins.

11 Co., 80 F.3d 336,337-38 (9th Cir. 1996).  Rule 8(a)(2) requires only "a short and plain

12 statement of the claim showing that the pleader is entitled to relief" in order to "give the

13 defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell

14 Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41,

15 47 (1957)).  A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require

16 detailed factual allegations.  However, "a plaintiff's obligation to provide the grounds of

17 his entitlement to relief requires more than labels and conclusions, and a formulaic

18 recitation of the elements of a cause of action will not do."  Id. (internal citations and

19 quotations omitted).  A court is not required to accept as true a "legal conclusion

20 couched as a factual allegation."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009)

21 (quoting Twombly, 550 U.S. at 555).  "Factual allegations must be enough to raise a

22 right to relief above the speculative level."  Twombly, 550 U.S. at 555 (citing 5 Charles

23 Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004)

24 (stating that the pleading must contain something more than "a statement of facts that

25 merely creates a suspicion [of] a legally cognizable right of action.")).   In addition, a

26 motion to dismiss under Rule 12(b)(6) is appropriate where a plaintiff has not

27 demonstrated entitlement to a legal remedy even when the material allegations in the

28 complaint are accepted as true.  De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978).

1    A court granting a motion to dismiss a complaint must then decide whether to

2   grant leave to amend.  Leave to amend should be "freely given" where there is no

3   "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice

4   to the opposing party by virtue of allowance of the amendment, [or] futility of the

5   amendment . . . ."  Foman v. Davis, 371 U.S. 178, 182 (1962); Eminence Capital, LLC v.

6   Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the Foman factors as those to

7   be considered when deciding whether to grant leave to amend).  Not all of these factors

8   merit equal weight.  Rather, "the consideration of prejudice to the opposing party . . .

9   carries the greatest weight."  Id. (citing DCD Programs, Ltd. v. Leighton, 833 F.2d 183,

10   185 (9th Cir. 1987).  Dismissal without leave to amend is proper only if it is clear that "the

11   complaint could not be saved by any amendment."  Intri-Plex Techs. v. Crest Group,

12   Inc., 499 F.3d 1048, 1056 (9th Cir. 2007) (citing In re Daou Sys., Inc., 411 F.3d 1006,

13   1013 (9th Cir. 2005); Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir.

14   1989) ("Leave need not be granted where the amendment of the complaint . . .

15   constitutes an exercise in futility . . . .")).

16    In ruling on a motion to evidence, the Court may properly consider not only the

17   complaint along with any evidence in documents attached or referred to in the complaint,

18   but also matters that may be judicially noticed pursuant to Federal Rule of Evidence 201.

19   Mir v. Little Co. of Mary Hosp., 844 F.2d 646, 649 (9th Cir. 1988).

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

8

1

**ANALYSIS**

2

3      **A.  Violation of the Medicaid Act**

4

5          <u>Preliminary Considerations</u>:  In challenging the sufficiency of Plaintiffs' First Claim

6      for Relief, which alleges a violation of the Medicaid Act, Defendants initially challenge

7      whether the violations Plaintiffs identify are ripe for adjudication in the first instance, and

8      whether Plaintiffs have standing to assert any claim based on the Medicaid Act in any

9      event.  In determining whether a case is ripe, issues of timing may be crucial.  If claims

10     remain unduly speculative they may never in fact occur, and in that event should not be

11     the subject of a federal lawsuit.  <u>Wolfson v. Brammer</u>, 616 F.3d 1045 (9th Cir. 2010.  By

12     avoiding  premature adjudication, the ripeness doctrine prevents courts from becoming

13     enmeshed in abstract disagreements.  <u>Id</u>.  Defendants' basic argument in this regard is

14     that Plaintiffs have failed to identify specific services or supports available under the

15     HCBS waiver program that have been denied or eliminated as a result of reimbursement

16     reduction to the regional centers for such services.  Plaintiffs go on to argue that in the

17     absence of specific evidence that Plaintiffs sought an exemption for reductions impacting

18     the health and safety of the disabled consumers, there also is no issue fit for judicial

19     resolution.

20          Defendants' related standing issue also focuses on the alleged speculative nature

21     of the impact of Defendants' reductions on disabled consumers, as well as the same lack

22     of any exemption claim.  In order to have standing, Plaintiffs must show both an actual or

23     imminent  concrete and particularized injury in fact arising from the invasion of a legally

24     protected interest.  Plaintiffs must also show both a causal connection between that

25     injury and defendant's alleged conduct, and likelihood that the injury can be redressed

26     by the Court.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992).

27     ///

28     ///

1    In arguing standing is not present, Defendants also point to the fact that the disabled

2    community is entitled to community-based services under the Lanterman Act irrespective

3    of whether they also may qualify for such services under an HCBS waiver.  Defendants

4    therefore claim that any distinction between the two programs is all but illusory.

5          In this Court's view, Defendants overstate the burden Plaintiffs must carry to

6    overcome a pleadings challenge made in the context of a motion to dismiss.  At the

7    pleading stage, general factual allegations of injury resulting from a defendant's conduct

8    are all that is required given the presumption that general allegations "embrace those

9    specific facts that are necessary to support the claim." Lujan, 504 U.S. at 561.  As

10   Twombly instructs, only a short and plain statement sufficient to put a defendant on

11   notice of the claims being asserted is required, so long as that statement is more than a

12   formulaic conclusion.  Twombly, 550 U.S. 544, 555.

13         Here, Plaintiffs' allegations include representations that the reduced payments

14   place providers at risk of insolvency and have destabilized and degraded the quality of

15   care available to disabled individuals.  Plaintiffs further allege and that individuals with

16   the more severe impairment require the most intensive and costly care, therefore placing

17   them at more risk of being disparately impacted by the subject cuts. See Compl., ¶¶ 32,

18   38, 42, 52).  Those allegations, and all reasonable inferences therefrom, must be

19   deemed true and construed in the light most favorable to Plaintiffs, and are sufficient to

20   overcome any pleading challenge based on ripeness or standing. See Livid Holdings,

21   Ltd. v. Solomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005); Keams v. Tempe

22   Tech. Inst, 39 F.3d 222, 224 (9th Cir. 1994).

23         The Court  further rejects Defendants' contention that Plaintiffs' claims are moot

24   because the 4.25 percent reimbursement reduction referred to in the complaint (filed in

25   September of 2011) has in fact been converted to 1.25 percent since the remaining

26   three percent sunsetted in June of 2012.  As Plaintiffs point out, that reduction goes only

27   to the amount of financial impact and does not obviate the impact entirely, particularly for

28   purposes of a motion to dismiss.

1    The fact that some of the statutory cuts have expired, with others still remaining in effect,

2    does not obligate Plaintiffs to file an amended complaint since the discrepancy is a

3    matter of proof as opposed to a factor bearing on liability itself.

4         Plaintiffs' success in bridging any hurdle to ripeness or standing ultimately makes

5    no difference to the viability of their Medicaid Act noncompliance claim; however, since,

6    as discussed below, that claim fails on the merits as a matter of law.  We first examine

7    the setting in which Plaintiffs allege that Defendants failed to abide by the provisions of

8    the Act.

9         Alleged  Medicaid Violation:  Plaintiffs basically contend that the State failed to

10   comply with the rate setting requirements set forth in 42 U.S.C. § 1396a(a)(30)(A)

11   ("Section 30(A)").  Section 30(A) requires that payment for services must be "consistent

12   with efficiency, economy, and quality of care."  The Ninth Circuit, in its Orthopaedic

13   decision, interpreted this statutory language as meaning that "payments must be

14   sufficient to enlist enough providers to provide access to Medicaid recipients."

15   Orthopaedic Hosp. v. Belshe, 103 F.3d 1491, 1496 (9th Cir. 1997).  The Orthopaedic

16   case further found that DHCS "must set hospital outpatient reimbursement rates that

17   bear a reasonable relationship to an efficient and economical hospital's costs of

18   providing quality services, with such determinations resting on "responsible cost studies"

19   that "provide reliable date as a basis for its rate setting."  Id. Plaintiffs claim that the State

20   has done nothing to ascertain whether the challenged payment reductions are consistent

21   with federal rate-setting standards and requirements.

22        Defendants take issue with Plaintiffs' argument in several ways.  First, they argue

23   that Section 30(A), while applicable to Medicaid in general, nonetheless does not apply

24   to an HCBS waiver like that at issue here.  According to Defendants, the HCBS waiver

25   regulations themselves appear to exempt waiver applicants from the Section 30(A)

26   requirements.

27   ///

28   ///

1  Second, Defendants point to a recent Ninth Circuit decision, Managed Pharmacy Care v.

2  Sebelius, 2013 WL 2278620 (9th Cir. May 24, 2013)[4] that they claim is controlling here.

3  Managed Care found that where, as here, CMS approves state provisions that include

4  reimbursement reductions, that approval is entitled to so-called Chevron deference.

5       Section 30(A) provides that a state plan for medical assistance under the

6  Medicaid Act must:

7       provide such methods and procedures relating to the utilization of, and the
        payment for, care and services available under the plan… as may be
8       necessary to safeguard against unnecessary utilization of such care and
        services and to assure that payments are **consistent with efficiency,**
9       **economy, and quality of care and are sufficient to enlist enough**
        **providers** so that care and services are available under the plan at least to
10      the extent that such care and services are available to the general
        population in the geographic area.
11

12  42 U.S.C. § 1396a(a)(30)(A) (emphasis added).

13       This language, as the Ninth Circuit recognizes, is "broad and diffuse." Sanchez v.

14  Johnson, 416 F.3d at 1060. By using terms like "consistent", "sufficient," efficiency," and

15  "economy," without describing the specific steps a take must take in order to meet such

16  standards, the amorphous language of the statute indicates that agency expertise is

17  relevant in determining its application. Managed Care, 2013 WL at *9, citing Douglas v.

18  Indep. Living Ctr. of S. Cal., 132 S. Ct. 1204, 1210 (2012).

19       In Orthopaedic, the Ninth Circuit interpreted the statutory mandate of Section

20  30(A) as requiring Medicaid reimbursement rates to "bear a reasonable relationship to

21  efficient and economical" hospital costs for providing quality services. To do this, the

22  Orthopaedic court reasoned, the state had to "rely on responsible cost studies, its own or

23  others, that provide reliable data as a basis for its rate setting." 103 F.3d at 1496.

24  ///

25  ///

26

27  [4] The Managed Care decision was initially issued on December 13, 2012. Managed Pharmacy
    Care v. Sebelius, 705 F.3d 934 (9th Cir. 2012). On May 24, 2013, after no rehearing en banc was
    requested, the initial decision was withdrawn and reissued without significant change at 2013 WL
28  2278620.

1   As Defendants note, this interpretation of Section 30(A) as requiring cost studies is not

2   found in the statute itself and was made in the absence of any agency approval for the

3   reimbursement reductions that the Orthopaedic court considered.

4          The Managed Care decision looks at the issue anew under circumstances where

5   CMS had in fact approved reimbursement reductions incorporated within a proposed

6   State Plan Amendment ("SPA") for the provision of Medicaid services in general.

7   Plaintiffs in that case argued that because cost data had not been provided in the SPA

8   submitted by California, the Ninth Circuit's prior Orthopaedic decision mandated that any

9   reimbursement reduction approval be voided.  Even  the Orthopaedic court, however,

10  recognized that "our standard of review might have been different had the agency

11  spoken on the issue."  See Managed Care, 2013 WL 2278620 at *7.  Significantly, in

12  Managed Care, unlike Orthopaedic, CMS did explicitly approve the SPA at issue, even

13  though no cost studies had been submitted.  The Managed Care court held that the

14  agency's decision in that regard was entitled to deference, and found that California is

15  not required to conduct cost studies or follow any specific procedural steps before

16  reducing Medicaid reimbursement rates under Section 30(A).  Managed Care, 2013 WL

17  2278620 at *2.

18         Defendants argue that because CMS in this case approved the HCBS waiver

19  submitted by California, then Managed Care disposes of Plaintiffs' seminal claim that the

20  reimbursement reductions run afoul of Medicaid law.  Plaintiffs, on the other hand, try to

21  distinguish Managed Care on grounds that it involved approval of an SPA amendment,

22  not an HCBS waiver and should, accordingly, be distinguishable.  Plaintiffs further

23  contend that CMS lacked any real cost of service information, and that any approval

24  without that information was in error.

25         The fact that Managed Care involved an SPA amendment and the present case

26  revolves around an HCBS waiver is not of consequence.   In both instances, CMS

27  approval for state Medicaid programs involving reimbursement reductions is involved.

28  ///

1    Moreover, with respect to whether adequate information was presented to CMS with

2    respect to cost was presented, in accordance with Managed Care, that question is

3    superseded by the fact that CMS approved the waiver.  Here, California submitted a

4    waiver application in excess of 200 pages.  That application was required to provide

5    information about 1) methods for assessing financial accountability and cost-neutrality;

6    2) information regarding the utilization of services by consumers, including the number of

7    participants and information regarding the utilization of specified services; and

8    3) assurances that the state will protect the health and welfare of beneficiaries, including

9    assurances that the state will provide ongoing assessment of a consumer's need for

10   services, and a plan for evaluation.  42 C.F.R. §§ 441.302-303.   While Plaintiffs contend

11   that CMS never required any specific information with regard to rates or rate

12   methodology in the HCBS waiver, CMS nonetheless approved the waiver application on

13   the basis of the detailed application that was submitted.  Significantly, to counter any

14   claim that insufficient information was in fact provided, CMS also has authority to revoke

15   an HCBS waiver application at any time if it determines, post-approval, that a state is not

16   in compliance.  Id. at §§ 430.25, 441.300-310.

17        Given these requirements, the Court concludes that CMS' determination in

18   approving California's 2012 waiver application is entitled to Chevron deference just as

19   the SPA approval was so deemed in Managed Care.  To the extent that CMS approved

20   the waiver in error for any reason, as the Supreme Court notes that shortcoming should

21   be brought to CMS' attention directly by way of a claim under the Administrative

22   Procedures Act, 5 U.S.C. § 701, et seq., rather than through the present lawsuit against

23   California.  See Douglas v. Indep. Living Ctr. of S. Cal., 132 S. Ct. at 1210.

24        Secondly, and just as importantly, the cost study information that Plaintiffs argue

25   should have been included does not appear to have been required for a waiver in any

26   event.  42 C.F.R. § 441.303(g) indicates that cost analysis is optional, rather than

27   required, in the context of waiver applications.  As the regulations state: "The State, at

28   its option, may provide for an independent assessment of its waiver that evaluates the

14

1   quality of care provided, access to care, and cost neutrality." Id.  Significantly this

2   language for all intents and purposes incorporates the considerations set forth in Section

3   30(A).  By expressly indicating that such information is not mandatory, a persuasive

4   argument can be made that Section 30(A) compliance is not required, just as

5   Defendants contend.  At the very least, that interpretation of the regulations is a

6   reasonable one.  Agency interpretation and application of its own regulations is entitled

7   to deference.  Chase Bank USA v. McCoy, 131 S. Ct. 871, 880-82 (2011); Auer v.

8   Robbins, 519 U.S. 452, 461 (1997) (federal agency's interpretation of regulation entitled

9   to deference unless "plainly erroneous or inconsistent with the regulation").

10          It follows that the crux of Plaintiffs' merits argument fails on the merits, since CMS'

11   approval of Defendants' waiver application, which encompasses the reductions at issue,

12   is entitled to deference under Managed Care.   CMS' approval also forecloses the

13   procedural means by which Plaintiffs sought to assert their Medicare claim in the first

14   place.  Analyzing Plaintiffs' procedural options shows yet another reason why Plaintiffs'

15   Medicaid Act claim fails.

16          Procedural Alternatives:  Plaintiffs concede that their Medicaid Act claim must be

17   premised either on 42 U.S.C. § 1983 or upon the Supremacy Clause of the United

18   States Constitution.  Neither alternative, however, is an option under the facts of this

19   case.

20          First, with respect to 42 U.S.C. § 1983, Plaintiffs acknowledge that the Ninth

21   Circuit has already recognized the unavailability of  a § 1983 action to challenge a

22   state's violation of the Medicaid Act.  Devl. Services Network v. Douglas, 666 F.3d 540,

23   (9th Cir. 2011).   Since the Ninth Circuit has further barred the use of § 1983 for a private

24   cause of action challenging the State's compliance with the requirements of Section

25   30(a), Sanchez, 416 F.3d at 1060; Ball v. Rodgers, 492 F.3d 1094, 1107-09 (9th Cir.

26   2007), Plaintiffs can only rely on the Supremacy Clause to support their Medicaid Act

27   claim.

28   ///

15

1   Plaintiffs note that Douglas, in finding § 1983 unavailable for purposes of making a

2   Medicaid Act claim, did not address the availability of the Supremacy Act for that

3   purpose.  Douglas, 666 F.3d at 548, n.29.  That brings us to the next potential avenue

4   for Plaintiffs' requested relief.

5        Because the Secretary has already approved the reimbursement rates at issue by

6   way of the HCBS waiver, Plaintiffs' Supremacy Clause claim would appear to be

7   foreclosed.  A Supremacy Clause remedy may be available with respect to a State's

8   determination as to a matter, like the reimbursement provisions at issue here, that bear

9   upon eligibility for federal benefits (here Medicaid).   In the absence of federal approval

10  for such  provisions, Plaintiffs  can at least conceivably seek federal adjudication of the

11  state action through the Supremacy Clause.   The Ninth Circuit's Managed Care

12  decision, however, while not definitively deciding the issue, expressed strong

13  reservations as to whether a Supremacy Clause action is available where, as here, the

14  responsible federal agency has approved the reimbursement cuts at issue.  Managed

15  Care, 201e WL at 2278620 at *14.  As Managed Care recognized, a reasoned decision

16  in that regard is entitled to deference.  Id. at * 9.   Where Congress has given an agency

17  authority to regulate a subject matter, it is appropriate for courts to give deference to the

18  agency's resolution of issues related thereto.  U.S. v. W. Pac. R.R. Co., 352 U.S. 59,

19  64-65 (1956) (recognizing an agency's power to determine issues "that have been

20  placed in the special competence of that administrative body").   Here CMS approves a

21  waiver only if it determines that a state complies with the Act.  42 C.F.R. 430.25(g).

22  Moreover, as already indicated, if CMS determines after that approval that a state is not

23  in compliance with the Act and its waiver requirements for any reason, it has the

24  authority to revoke the waiver.  42 C.F.R. §§ 441.302, 441.304.

25        In the instant matter, as indicated above, CMS approved California's waiver

26  program after reviewing the extensive 200-page HCBS application.[5]

27        [5] Contrary to Plaintiffs' argument, there appears to be no requirement under the HCBS waiver

28  program that express federal approval be obtained before implementing payment reductions.  See Defs.'
    Reply, pp. 8-9.  To the extent that CMS should not have approved reimbursement reductions that went

1   As the Supreme Court has also recognized, "to allow a Supremacy Clause action to

2   proceed once the agency has reached a decision threatens potential inconsistency or

3   confusion."  Douglas, 132 S. Ct. at 1210.  Instead, as indicated above, the more

4   appropriate means of redress would be not the Supremacy Clause challenge Plaintiffs

5   have mounted against the State but rather a review of CMS' approval determination

6   itself under the APA.  The Supreme Court's Douglas decision expressly points out that

7   the APA provides for judicial review of final actions and allows agency action found to be

8   arbitrary and capricious to be set aside.  Id. citing the APA at 5 U.S.C. §§ 704, 706(2)(A).

9        In sum, while preliminary considerations of ripeness and/or standing do not

10  appear to bar Plaintiffs' Medicaid Act claims in this matter, those claims ultimately fail on

11  the merits and are not cognizable procedurally under either Section 1983 or the

12  Supremacy Clause  in any event.  Therefore, Plaintiffs' First Claim for Relief, for Violation

13  of the Medicaid Act, fails, and Defendant's Motion to Dismiss that Claim is granted.

14

15      **B.  ADA and Rehabilitation Act Claims**

16

17       Plaintiffs' Second and Third Claims seek injunctive relief under the Rehabilitation

18  Act and the ADA, respectively.  To establish a violation under either of those statutory

19  schemes, Plaintiffs must show 1) that they are qualified individuals with a disability;

20  2) that they were excluded from participation in or otherwise discriminated against with

21  regard to a public entity's services, programs, or activities; and 3) that such exclusion or

22  discrimination was by reason of their disability.  See Lovell v. Chandler, 303 F.3d 1039,

23  1052 (9th Cir. 2002).  The prohibition against discrimination requires that "meaningful

24  access" be provided.  Lonberg v. City of Riverside, 571 F.3d 846, 851 (9th Cir. 2009).

25  ///

26  ///

27  _____

28  into effect before it issued its approval, however, redress at this point would be against CMS under the
    auspices of the APA rather than the present suit against the State.

1  Because the ADA and Rehabilitation Act contain nearly identical language, they are

2  evaluated as mutually coextensive and claims under either are generally treated as one

3  and the same.  Sanchez, 416 F.3d at 1016.

4          With respect to Plaintiffs' capacity to bring these claims on behalf of affected

5  developmentally disabled individuals, Defendants assert that Plaintiffs lack associational

6  standing to challenge the funding cuts, arguing that such standing requires that a

7  group's individual members need not participate in the lawsuit.  While the capacity of

8  individually disabled individuals to meaningfully participate in this litigation other than

9  auspices of a group or other individuals seems questionable on its face, it would appear

10  that Plaintiffs, at the very least, have representational standing.  Even if an organization

11  has not itself suffered injury (Plaintiffs are non-partisan, non-profit organizations

12  representing the rights and interests of individuals with I/DD, their families and their

13  community providers), the organization can still sue in a representative capacity for

14  injuries to its members as long as at least one member has standing to sue in his or her

15  own right, the interests sought to be protected are germane to the association's

16  purpose, and neither the claims asserted nor relief requested requires member

17  participation in the suit individually.  Hunt v. Washington State Apple Advertising

18  Comm'n, 432 U.S 333, 343 (1977).  Moreover, to the extent that Plaintiffs seek

19  declaratory and injunctive relief, individual members of Plaintiffs' organizations are not

20  required to participate in the action in any event.  See Or. Advocacy Ctr. v. Mink,

21  322 F.3d 1101, 1112-13 (9th Cir. 2003).  Finally, and perhaps more significantly, the

22  Ninth Circuit has already recognized the associational standing of organizations like

23  ARC in similar cases.  See, e.g., ARC of Washington State  v. Braddock, 427 F.3d 615

24  (9th Cir. 2005) (alleging violation of the ADA).  Consequently, the Court does not find

25  standing to pose a bar to Plaintiffs' claims under the ADA and the Rehabilitation Act.

26  ///

27  ///

28  ///

1    In addition to challenging Plaintiffs' standing, the defense also argues that

2    Plaintiffs cannot state a prima facie case of discrimination in the first place, arguing that

3    Plaintiffs have failed to show that either providers or consumers will suffer a disparate

4    impact, or that Defendant's challenged actions were due to their disability.  On the basis

5    of the allegations contained in Plaintiffs' Complaint, however, which must be accepted as

6    true in the context of a motion to dismiss, the challenged reductions will decrease the

7    risk of institutionalization for the disabled served under the waiver (see Compl., ¶¶ 32,

8    45-49), with the most seriously disabled being most at risk since they require the most

9    intensive and costly care and therefore will be impacted most as a result of payment

10    cuts.  Id. at ¶¶ 38, 42, 45-49, 52.  These allegations are sufficient to survive Defendants'

11    Motion to Dismiss Plaintiffs' ADA and Rehabilitation Act claims.

12

13    **C.  Declaratory Relief**

14

15    Plaintiffs' Sixth Claim for Relief seeks declaratory relief, under the Federal

16    Declaratory Judgment Act, 28 U.S.C. § 2201.   In particular, Plaintiffs seek a declaration

17    of the respective rights and duties with respect to the implementation, administration,

18    and interpretation of the Medicaid Act, the HCBS waiver program, and the Lanterman

19    Act.  Compl., ¶ 72.  Plaintiffs argue that because Plaintiffs have not otherwise stated any

20    claim for relief in their Complaint, the Federal Declaratory Judgment Act cannot create

21    an independent basis for the Court to exercise its jurisdiction.  S. Pac. Co., v. McAdoo,

22    82 F.2d 121, 122 (9th Cir. 1936).  Because the Court has not dismissed Plaintiffs' claims

23    under the ADA and the Rehabilitation Act, however, the basis for Plaintiff's challenge to

24    any potential federal declaratory relief in this matter fails.

25    ///

26    ///

27    ///

28    ///

1    **D. State Claims**

2

3        Plaintiffs' state law claims, as set forth in their Fourth and Fifth Claims for Relief,

4    seek injunctive relief under the Unruh Civil Rights Act, Cal. Civil Code § 51, et seq., as

5    well as mandamus relief under California Code of Civil Procedure § 1085.[6]  Defendants

6    allege that those claims are barred by the doctrine of sovereign immunity in accordance

7    with the Eleventh Amendment to the United States Constitution.  It is well established

8    that sovereign immunity does not, however, bar actions to compel a state official's

9    prospective compliance with a plaintiff's federal civil rights.   Independent Living Center

10   of So. Cal., Inc. v. Maxwell-Jolly, 572 F.3d 644, 660 (9th Cir. 2009), citing Ex parte

11   Young, 209 U.S. 123, 156 (1908), vacated on other grounds by Douglas, 132 S. Ct.

12   1204.  Consequently there is no doubt that Plaintiffs' federal claims, which uniformly

13   seek injunctive relief and are asserted against state officials, are proper.

14        Plaintiffs' state claims are similar to their claims premised on federal law in

15   seeking only prospective injunctive and declaratory relief as opposed to any retroactive

16   award of money damages. The Court agrees that those state claims are "so related" to

17   the federal claims that they form part of the same case or controversy under 28 U.S.C.

18   1367(a), the statute authorizing supplemental jurisdiction over state claims in any civil

19   action over which the federal court has original jurisdiction.   Because Plaintiffs' federal

20   claims under the ADA and the Rehabilitation Act  here unquestionably invoke this

21   Court's original jurisdiction, supplemental jurisdiction over Plaintiffs' remaining state law

22   claims is also proper.[7]

23   ///

24   _____

25        [6] In the Sixth Cause of Action, declaratory relief is also sought under California Code of Civil
     Procedure § 1060 in addition to declaratory relief under the Federal Declaratory Judgment Act as
26   discussed above.

27        [7] Defendants' reliance on Raygor v. Regents of Univ. of Minn., 534 U.S. 533 (2002), is inapposite
     because in that case, Plaintiffs' federal claims had already been adjudicated at the time Plaintiffs
     attempted to characterize refiled state law claims as supplemental. In the present matter, on the other
28   hand, viable federal claims still exist in addition to the supplemental state claims.

**CONCLUSION**

For all the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 53). Is GRANTED in part and DENIED in part.  The Motion is granted as to Plaintiffs' First Claim for Relief, for injunctive relief under the Medicaid Act, but denied as to all remaining Counts.  Because the Court concludes that the deficiencies of Plaintiffs' First Claim for Relief cannot be rectified by amendment under the circumstances present herein, no leave to amend that Claim will be permitted.

IT IS SO ORDERED.

Dated:  July 1, 2013

_____
MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT